Jonathan T. Suder [TX Bar No. 19463350]
Michael T. Cooke [TX Bar No. 04759650]
Todd I. Blumenfeld [TX Bar No. 24067518]
FRIEDMAN, SUDER & COOKE, P.C.
Tindall Square Warehouse No. 1
604 E. 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone: (817) 334-0400
Facsimile:   (817) 334-0401
Email: jts@fsclaw.com
Email: mtc@fsclaw.com
Email: blumenfeld@fsclaw.com

Keith A. Rutherford [TX Bar No. 17452000]
Daniel R. Peterson [TX Bar No. 24065899]
WONG, CABELLO, LUTSCH, RUTHERFORD
     & BRUCCULERI, L.L.P.
20333 SH 249, Suite 600
Houston, Texas  77070
Telephone: (832) 446-2400
Facsimile:   (832) 446-2424
Email: krutherford@counselip.com
Email: dpeterson@counselip.com

L. Kristopher Rath, Esq. [NV Bar No. 5749]
HUTCHISON & STEFFEN, LLC
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada  89145
Telephone: (702) 385-2500
Facsimile:   (702) 385-2086
Email: krath@hutchlegal.com

Counsel for Plaintiff
ALTO VENTURES, INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA
## SOUTHERN DIVISION

| | |
|---|---|
| ALTO VENTURES, INC. | |
| Plaintiff, | CASE NO. 2:11-cv-01056-PMP-CWH |
| vs. | JURY TRIAL DEMANDED |
| CONVERGYS CORP., FIVE9, INC., TELETECH HOLDINGS, INC., TRANSERA COMMUNICATIONS, INC., WEST CORP., and WSOL, INC. (d/b/a Working Solutions), | **OPENING CLAIM CONSTRUCTION BRIEF PURSUANT TO LR 16.1-16** |
| Defendants. | |

## I.    BACKGROUND AND NATURE OF CASE

Pursuant to the requirements of Nevada District Court Local Rules of Practice L.R. 16.1-16 and the Scheduling Order, Plaintiff Alto Ventures, Inc. ("Alto Ventures" or "Plaintiff") hereby submits its Opening Claim Construction Brief.  Attached as Exhibit A is the parties' Joint Claim Construction Statement ("Joint Statement") prepared in accordance with this Court's Local Rule 16.1-15 and filed June 4, 2012 (Dkt. No. 137).   Each of the disputed limitations in each of the asserted claims is discussed in this Brief.  A total of three claims— claims 1, 6, and 16—are being asserted from the patent-in-suit, U.S. Patent No. 7,418,092 ("the '092 patent"), attached as Exhibit B.  Plaintiff originally proposed that 4 terms needed construction, while the Defendants[1] originally proposed that 18 terms needed construction. Via the meet-and-confer process, there now remain 10 distinct terms on which the parties seek the Court's construction.  Plaintiff will address all terms proposed by both parties here.

## II.    THE PATENT-IN-SUIT

Wendell D. Brown is the inventor of the patent-in-suit, entitled "Virtual Call Center". Mr. Brown specializes in the development of innovations in the electronics and telecommunications industries, including the virtual call center industry.  Mr. Brown performs his work on virtual call centers through Alto Ventures, which he owns with one other party. Mr. Brown assigned the patent application that became the '092 patent to Alto Ventures. Alto Ventures has been—and continues to be—the owner of the '092 patent.

_____

[1] The remaining Defendants in the lawsuit are: Teletech Holdings, Inc. and West Corporation.

Mr. Brown is the sole inventor of the '092 patent. Mr. Brown is a serial inventor and entrepreneur, who has owned and operated several telecommunications businesses over the course of his career in Nevada and other states.

Mr. Brown created the eVoice voicemail platform, the first large-scale, Internet-enabled voicemail system in 2000. Mr. Brown pioneered techniques such as voicemail-to-email, visual voicemail, and enhanced caller ID. eVoice supplied voicemail solutions to AT&T, MCI, AOL, as well as to many regional companies. eVoice was acquired by AOL Time-Warner in 2001, and the eVoice platform subsequently became part of the AOL voice services group.

Mr. Brown later co-founded a company called Teleo, an early competitor to Skype. Teleo's software integrated with computer desktops and allowed users to place and receive telephone calls from Microsoft Outlook, Internet Explorer, and other applications. Teleo allowed users to place PC-to-PC calls to other Teleo users anywhere in the world for free and to receive calls from regular telephones for free. Calls placed from Teleo to regular telephones were "pay as you go," using flexible minutes with two-cent-per-minute calling to anywhere in the world. Teleo was later acquired by Microsoft in 2005.

Along the way, Mr. Brown has filed for more than 40 patents both domestically and internationally in the fields of telecommunications (including the patent-in-suit), electric car technology, and online music distribution. The patent-in-suit is about a particular type of call center technology referred to as virtual or distributed call centers. In the past, and still in many instances today, companies have centralized call centers to handle the numerous customer calls that they receive (and/or send). In such a situation, the company owns and operates the equipment necessary to operate the call center, and, generally, the call-taking agents (e.g., a customer service representative) are on-site. In a "virtual" or "distributed" call

center, the call-taking agents can be anywhere (including at home), and maybe the company need not even own or operate the call routing equipment.  Rather, the company can contract with a service provider that hosts the call center equipment.  For example, calls originating from a company's customer could terminate at the service provider's call center/equipment rather than the company's premises or equipment.    The service provider's telephony equipment could then connect the call to an agent working on the company's behalf.

Such virtual call centers have a number of limitations and challenges, including the expense associated with having enough equipment and other resources to handle peak call capacity and having to add equipment and infrastructure as business grows.  Moreover, if a company's call-taking agent is outside the call center's premises, then an increase in numbers of circuits is necessary.  For example, when a customer calls, an incoming circuit is used to deliver the call to the service provider's switching equipment, and a second circuit is used to connect from the switching equipment to the company's agent.

A typical call originating from a company's customer has at least two components:  (1) bearer (i.e., voice) data; and (2) signaling (logic) data, such as the customer's phone number, the customer's name, and location information.    Both kinds of data may be transmitted in two companion channels: a voice channel; and a signaling (logic) channel. The voice channel has a much higher data usage rate than the signaling (logic) channel and, therefore, its data is much more expensive and time-consuming to move around than the signaling (logic) data.

The patent-in-suit describes a real-time call control system with minimal requirements for dedicated telecommunications PBX and dedicated switching equipment.    A call's signaling (logic) channel and bearer (voice) channel are handled separately, allowing the voice carriage to continue to be handled by the network carrier (or company-owned central

PBX), while the data portion of the call can be forwarded to a device separate from the device handling the voice portion of the call, including devices outside of the carrier's network.  The separate device then can utilize the data portion of the call, along with other information, to optimize routing of the voice portion of the call based on various parameters related to the call-taking agents.  This remote routing decision is facilitated by use of a real-time signaling path and interface, such that the associated routing decisions and business logic can work at real-time speed utilizing only the data portion of the call while the voice component of the call remains elsewhere.

As shown in the annotated version of Figure 1 of the '092 patent below, phone calls can come in to the "virtual call center" over either the PSTN or VOIP from callers (orange) and are passed to call control system 10 (red).  Within the call control system, the voice portion of the call (green) is handled at a separate device from the device(s) where the logic and routing functionality (blue) is handled.  This arrangement allows one logic and routing system (blue) to provide routing decisions for several different companies who may wish to have their incoming calls routed by the "virtual call center."  Once the appropriate routing decision has been made by the logic and routing system (blue), the call is directed on to the call-taking agent (purple) over either the PSTN or VOIP.  The call taking-agent may be located either at a traditional "brick and mortar" call center or working from home as an "at home agent."

4

'092 PATENT, FIGURE 1 (ANNOTATED)

What distinguishes Mr. Brown's invention, in part, from the prior art is the separate handling of the logical components of call routing and the bearer (voice) components at separate devices.  Doing so allows for  a more efficient handling of incoming calls, allowing a single "virtual call center" provider to handle the logic and directing of phone calls for one company or a number of companies, without the requirement of significant capital outlays by the companies purchasing the virtual call center services.

III.   **LEGAL PRINCIPLES GOVERNING CLAIM INTERPRETATION**

    a. **Markman Proceedings**

The purpose of the claim construction process is for the Court to ensure that the asserted claims of the patents-in-suit are defined as a person of ordinary skill in the art[2] would understand their meaning after having read and considered the "intrinsic evidence." The "intrinsic evidence" consists of the language of the asserted claims and other claims in the asserted patents, the description in the specification of the asserted patents, including the figures and detailed discussion, and the file containing all of the correspondence between the Patent Office and the patent applicant during the process of pursuing, i.e., "prosecuting," the patent application (this correspondence file and the associated prior art references that are included in this file is collectively referred to as the "file history" or "prosecution history").  Even if the claims on their face may be easily understood by a person of ordinary skill in the art,[3] the jury must still be able to understand the meaning of the asserted claims.  So, part of the claim construction process is not only to determine what the claims mean to one of skill in the art, but to define that meaning in words that the jury can understand and apply in order to determine if accused products or asserted pieces of prior art meet those claim elements.

One of the challenges that courts face in performing a claim construction analysis is the fact that one or both parties may attempt to argue that certain embodiments or

---

[2] The level of skill of the so-called "person of ordinary skill in the art," or POSITA, is considered as of the filing date of the patent being considered.  The level of skill of the theoretical person of ordinary skill in the art is to be evaluated and determined based on, e.g., the particular technology area that the patent addresses, as well as the educational or work experience level of others that would find the patented idea of interest in their business. Here, the technology of the asserted patent-in-suit falls under the broad category of telecommunications, and under the more specific category of call routing technology.

[3] In the instant case, a person of ordinary skill in the art may ultimately be found, for instance, to be a person with a particular number of years of work or research-related experience in the telecommunications field.

descriptions in the patent specification describe the *only* possible way a claim can be interpreted, and therefore particular claim elements—even if seemingly broader than the patent disclosure—may be urged by one or both parties to be interpreted more narrowly as covering just the particular embodiment or description in the patent specification.  However, it is a bedrock principle of patent law, that construing the claims is not a process of reading limitations or requirements into those claims from the written description of the patent itself, unless there are clear "words or expressions of manifest exclusion or restriction" by the patentee in the intrinsic evidence making it clear that a particular embodiment is the only way to interpret the claim element.[4]  As a simple example, if the claim element says, "a vehicle with more than one wheel," and the patent description only describes a two-wheeled vehicle, the claim element under these principles should be interpreted as having two *or more* wheels.  If, instead, the patent description said that the vehicle *must* have only two wheels, then the claim construction should acknowledge those words of "manifest exclusion," and the claim element should be interpreted as requiring two wheels.  Finally, if the claims as written would be clear to both those of skill in the art and the jury, the Court need not go further to create a construction that is not needed.[5]

### b. Law of Claim Construction

It is a bedrock principle of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *See Phillips v. AWH Corp.*, 415 F.3d

---

[4] *See Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

[5] *See U.S. Surgical Corp. v. Ethicon, Inc.* 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

1303, 1312 (Fed. Cir. 2005) (en banc).  The interpretation and construction of patent claims is a matter of law exclusively for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Claim construction is the process of giving proper meaning to the claim language, and ultimately, defining the scope of protection.  *Bell Communications Research v. Vitalink Communications Corp.,* 55 F.3d 615, 619 (Fed. Cir. 1995). The purpose of claim construction is to "understand and explain, but not to change, the scope of the claims."  *Embrex, Inc. v. Service Eng'g Corp.,* 216 F.3d 1343, 1347 (Fed. Cir. 2000).

        "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).  In the event that the court is able to ascertain an unambiguous meaning of the claim term after examination of only the intrinsic evidence, claim construction is complete.  *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1332 (Fed. Cir. 2001).  The Federal Circuit states that "proper construction of the claims is based upon the claim language, the specification, the prosecution history, and if necessary to aid the Court's understanding of the patent, extrinsic evidence."  *Glaxo Inc. v. Novopharm Ltd.,* 110 F.3d 1562, 1565 (Fed. Cir. 1997).

        The Court interprets the claims as used in the context of the specification to arrive at the most precise claim interpretation:  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Throughout the process of claim construction, the Court aims to give patent claim terms their meaning as understood by one of ordinary skill in the art. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 955 (Fed. Cir. 2000). The objective standard of one of ordinary skill in the art is measured at the time of the invention, *i.e.* as of the effective filing date of the application. *Phillips,* 415 F.3d at 1313; *Markman,* 52 F.3d at 386.

As noted by the Federal Circuit, the respective roles of the claim language and the specification during the claim construction process are defined by the two canons which sometimes appear in tension, namely that "(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation." *Renishaw*, 158 F.3d at 1248. The Federal Circuit, nevertheless, has repeatedly held that it is improper to import limitations from embodiments disclosed in the specification to limit or otherwise vary the meaning of the claim language. *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a ***clear intention to limit the claim scope*** using 'words or expressions of manifest exclusion or restriction.'" *Id.* at 906 (citation omitted) (emphasis added).

1

## IV.    CLAIM TERMS FOR CONSTRUCTION

2

3    a.  **"separating the call into components of a signaling channel (16) and a bearer channel (18)" / "an apparatus configured to separate the call into components of a signaling channel and a bearer channel"**

4

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "separating the call into components of a signaling channel (16) and a bearer channel (18)"<br><br>['092 patent (Claim 1)] | "sending the signaling channel and bearer channel of the call to separate devices" | "the incoming gateway performing the act of splitting a call that contains the information about the call and the voice content of the call into two distinct components, one comprising the information about the call and one comprising the voice content of the call" |
| "an apparatus configured to separate the call into components of a signaling channel and a bearer channel"<br><br>['092 patent (Claim 16)] | "an apparatus configured to send the signaling channel and bearer channel of the call to separate devices" | "an incoming gateway, which performs the act of splitting a call that contains the information about the call and the voice content of the call into two distinct components, one comprising the information about the call and one comprising the voice content of the call" |

5

6

7

8

9

10

11

12

13

14

15

16

17    A person of ordinary skill in the art reading the term "separating the call into

18    components of a signaling channel (16) and a bearer channel (18)" in the context of the

19    asserted method claim 1 of the '092 patent[6] would understand this term to mean "sending

20    the signaling channel and bearer channel of the call to separate devices."  This meaning is

21    compelled by the plain claim language, and is confirmed by the teaching of the specification.

22

23    Alto Ventures' proposed construction reflects the fact that the '092 patent teaches the

24    separation of the logical components of call routing to different equipment from the

25    equipment where the bearer (voice) components are handled.  Defendants, on the other

26    _____

27    [6] Apparatus claim 16 uses this term in a nearly identical fashion, merely preceding the term with the words, "an apparatus configured to" [separate the call into components of a signaling channel and a bearer channel].

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

hand, propose that these terms be construed such that the "incoming gateway perform[s] the act of *splitting* a call that contains the information about the call and the voice content of the call *into* two distinct components, one comprising the information about the call and one comprising the voice content of the call."  (emphasis added)

Defendants' proposed constructions here are attempting to restrict the asserted claims to an embodiment that is specifically different than the preferred embodiment disclosed in the '092 patent.   For example, Figure 1 of the '092 patent, shown annotated above, specifically shows calls coming into the call control system 10 in either PSTN form or VOIP (Voice over Internet Protocol) form.  In VOIP form, the signaling information and voice component are already split and separated from each other.  As such, Figure 1 clearly shows an incoming call that has already been separated before reaching the Call Control System 10. Therefore, when claims 1 and 16 are referring to the Call Control System separating the call, that reference cannot be to splitting the components of the call (which would be contrary to Figure 1), but must instead refer to what happens within the Call Control System—the voice component is held at the incoming gateway, while the signaling component goes to the routing logic.

The role of the incoming gateway, then, is to send the components of the call to separate devices for handling, and cannot be to "split into two parts" a call which, clearly in Figure 1 with respect to the incoming VOIP call, arrives at the Call Control System already split.  The separation done by the Call Control System, as called for in claims 1 and 16, is sending one part of the call to a separate device (in the case of Figure 1, it is the signaling part of the call).  This "separation" role for the Call Control System and its incoming gateway is therefore only properly conveyed by Alto Ventures' proposed constructions in this Section

11

IV.a, and Alto Ventures' proposed constructions most naturally align with the act of "separating" as contemplated in the context of the invention disclosed in the '092 patent.

### b.  "via a digital voice packet connection"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "via a digital voice packet connection"<br><br>['092 patent (Claims 1, 16)] | "via a digital connection capable of carrying voice information" | "via digital voice pathways that move data in separate blocks based on the destination address in each block header" |

A person of ordinary skill in the art reading the term "via a digital voice packet connection" in the context of the asserted '092 patent claims would understand this term to mean "via a digital connection capable of carrying voice information."   This meaning is compelled by the plain claim language, and is confirmed by the teaching of the specification.

Alto Ventures' proposed construction reflects the fact that the connection in question is for carrying digital voice information, and that such information may be carried by any number of digital voice protocols, such as any of the well-known proprietary or open Voice over IP (VoIP) protocols.  *See* '092 patent at col. 2:52–3:4, 4:9–13; Fig. 1.

The construction of this term should not be limited as proposed by Defendants.  Defendants' proposed construction of "via digital voice pathways that move data in separate blocks based on the destination address in each block header" is overly burdensome and contains superfluous language that would not be helpful to a jury.  For example, nothing in the intrinsic record mandates that the data must be moved "in separate blocks based on the destination address in each block header."  In other words, there are no words of "manifest exclusion" requiring additional limitations or requirements to this claim element.  In fact, the Defendants are going beyond trying to import limitations from the patent specification itself,

and are instead trying to import limitations that are not even disclosed in the patent specification itself—clearly inappropriate in a claim construction setting where the Court must first limit its consideration to the intrinsic record. But, even accepting for the moment that there was basis to look outside the intrinsic record, Defendants' own proposed dictionary definition of "packet" from Newton's Telecom Dictionary, 20th ed., is not so narrowing, defining a packet as: "Generic term for a bundle of data, usually in binary form, organized in a specific way for transmission. . . . A packet consists of the data to be transmitted and certain control information."[7]

Thus, because packet is a generic term for a bundle of data organized in a specific way, Plaintiff's proposed construction most closely captures the meaning of the term "via a digital voice packet connection" without adding further unnecessary limitations regarding "destination addresses" and "block headers," as Defendants' proposed construction attempts to do. For these reasons, the term "via a digital voice packet connection" should be construed to mean, simply: "via a digital connection capable of carrying voice information."

### c. "contemporaneously signaling"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "contemporaneously signaling"<br><br>['092 patent (Claim 16)] | "signaling at a time when the call is also in existence" | no construction necessary |

The purpose of claim construction is to help the fact-finder, typically a lay jury, understand the claims. Alto Ventures' proposed construction for "contemporaneously signaling" is merely intended to clarify *when* the signaling referred to by claim 16 takes place.

---

[7] *See, e.g.*, Ex. D, at TELE-00006963.

13

1     For two things to be "contemporaneous," they must be existing or occurring during the

2  same period of time.  With respect to Claim 16 of the '092 patent, apparatus (405) is

3  described as an "apparatus for *contemporaneously signaling* from the call control system to

4  an agent screen visual display at the termination point to provide call-specific information

5  regarding the call."  Thus, in the context of the asserted claim, the signaling is occurring at a

6  time when the call is also in existence.  *See* '092 patent at col. 4:56–60, 5:10–13; 6:3–6.

7     In other words, the signaling to the agent's visual display does not need to happen at

8  the exact instant that the call is placed or the exact instant that the voice content of the call

9  begins to be sent to the termination point.  Rather, Claim 16 only requires that that the

10  signaling is contemporaneous with the call, i.e., occurring during the existence of the call.

11  The patent specification is clear about this, stating: "Contemporaneously, as the network

12  carrier 300 completes the call to the specified termination point 501,601, the outside party

13  routing system 400 typically sends a data/text signal to the agent's computer terminal 502,

14  602 regarding the incoming call." '092 patent at col. 4:56–59.  So, the '092 patent says that

15  the sending of the data to an agent's terminal begins once the call is established.  It does not

16  say that the call and data must be received at the exact same time—in fact it is the opposite.

17  Alto Ventures' proposed construction clarifies this term for the jury so that it is not incorrectly

18  interpreted to mean "instantaneously" signaling or requiring the signaling to occur at any

19  particular moment during the call's existence.

### d.  "call routing system (400)"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "call routing system (400)"<br><br>['092 patent (Claims 1, 16)] | "system that determines termination point and qualified agent and is separate from the incoming and outgoing gateways" | "a device or set of devices, physically remote from the incoming and outgoing gateways, that manage and control the routing of calls while the telecommunications carrier network continues to carry the voice content of the calls" |

A person of ordinary skill in the art reading the term "call routing system" in the context of the asserted '092 patent claims would understand this term to mean a "system that determines termination point and qualified agent and is separate from the incoming and outgoing gateways."  This meaning is compelled by the plain claim language, and is confirmed by the teaching of the specification.

Alto Ventures' proposed construction reflects the fact that the primary purpose of the call routing system is to determine the ultimate termination point for the call based upon the determination of a qualified agent.  *See* '092 patent at Abstract; col. 3:43–57, 4:26–49; Fig. 1.  Alto Ventures' proposed construction also communicates to the trier of fact that the call routing system is separate from the incoming and outgoing gateways, as explained by the Applicant during the prosecution of the '092 patent: "Incoming calls are fielded at one gateway but are directed from a remote location through another gateway to remote agents, which receive input via a different channel to display terminals, typically computer terminals with Internet access.  Physically they may be incorporated into one another, and they may in fact share ports. But they are logically different."[8]

---

[8] '092 patent File History (attached as Exhibit C), Dec. 18, 2007 Amendment, pp. 8–9.

Defendants' proposed construction, on the other hand, *requires* that the device or set of devices making up the call routing system be "*physically remote* from the incoming and outgoing gateways." However, the specification clearly states that, "Routing system 400 *could physically be remote* or *in close proximity* to system 300 [i.e., the location of the gateways], system 500, or system 600." '092 patent at col. 3:43–46 (emphasis added). The term "remote" in the Defendants' proposed construction is open to confusion since it may be argued that remote would not incorporate "close proximity" as the patent description expressly calls out. As such, the inclusion of "remote" would add confusion rather than reduce confusion. Alto Ventures' use of "separate" incorporates the idea of the routing system either being remote or in close proximity to the gateway—it just needs to be separate, as the '092 patent describes. Thus, this part of Defendants' construction is unduly narrowing.

Alto Ventures also notes to the Court that, under the Manual of Patent Examining Procedures ("MPEP"), the use of "reference numerals" in the claims (such as the "(400)" in the claim term "call routing system (400)" here) corresponding to elements recited in the specification and drawings is to have no effect on the scope of the claim(s).[9] In other words, the fact that the reference numeral (400) appears in the claim language itself should not be

---

[9] *See* MPEP 608.01(m).

> "Reference characters corresponding to elements recited in the detailed description and the drawings may be used in conjunction with the recitation of the same element or group of elements in the claims. The reference characters, however, should be enclosed within parentheses so as to avoid confusion with other numbers or characters which may appear in the claims. *The use of reference characters is to be considered as having no effect on the scope of the claims*." *Id.* (emphasis added).

*See also Hochstein v. Microsoft Corp.*, 2009 U.S. Dist. LEXIS 128544, *39 ("While elements L1 and L2 are the specific 'communication couplers' parenthetically cross-referenced in claim 39, that optional use of reference characters in the claims has '*no effect on the scope of the claims*'") (emphasis added).

used to limit the claim scope to any particular embodiment shown in a patent drawing having the corresponding reference numeral.

Further, Defendants' proposed construction also *requires* that, "the telecommunications carrier network continues to carry the voice content of the calls." Such a scenario is not clearly required by the plain language of the claims or the specification. While a scenario wherein the telecommunications carrier network continues to carry the voice content is one embodiment disclosed in the specification, there is nothing in the specification or prosecution history surrendering claim scope covering other scenarios, e.g., when the voice content is carried at a location that is distinct and separate from the call routing system, but not necessarily co-located at the network carrier. In other words, there are no words of "manifest exclusion" requiring or limiting anything in the claim to a specific embodiment proposed by Defendants. As explained by the Applicant, "the call center is virtual. It has components in many different places. These physically distributed elements are spread over a number of systems."[10]

Thus, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a ***clear intention to limit the claim scope*** using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906 (citation omitted) (emphasis added). Alto Ventures therefore urges the Court to reject Defendants' proposed construction and adopt Alto Ventures' proposal that is more appropriately aligned with the patent's description of the invention and the canons of claim construction.

---

[10] '092 patent File History (attached as Exhibit C), Dec. 18, 2007 Amendment, pp. 8–9.

e. **"call center being physically distributed"**

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "call center being physically distributed" ['092 patent (Claim 1)] | no construction necessary | "the gateways, call routing system, and agents being in physically remote locations, where the call routing system manages and controls the routing of calls while the telecommunications carrier network continues to carry the voice content of the calls" |

Alto Ventures does not believe this phrase, "call center being physically distributed," should be construed.   Alto Ventures believes that a jury is more than capable of understanding what a phrase like "physically distributed" means.  Alto Ventures believes that a jury could understand such a term without any further construction from the Court.  Defendants, on the other hand, propose that "physically distributed" be construed as something completely unnecessary and unwieldy in view of the rest of the claim, namely, "the gateways, call routing system, and agents being in physically remote locations, where the call routing system manages and controls the routing of calls while the telecommunications carrier network continues to carry the voice content of the calls."  Adding that degree of unnecessary description to the ***preamble*** of the claim inappropriately narrows the claim to a single disclosed embodiment and would not be helpful to a jury attempting to apply the steps of method Claim 1.

Second, as mentioned above, this term appears within the preamble of Claim 1.  Alto Ventures contends that "call center being physically distributed," which occurs only in the preamble, needs no construction because the preamble of this claim is not "necessary to

give life, meaning, and vitality to the claim,"[11]  nor does it provide antecedent basis for terms in the claim.   Preambles describing a structural characteristic of an element involved in the practice of a method claim invention generally do not limit the method claim because the patentability of a method claim depends on the use or purpose of that element, not on the structural characteristics of that element.

The meaning of Claim 1 is clear without construing the preamble.  It is directed to a method for controlling routing of a telephone call in a call control system operative as a call center that is physically distributed.   The remaining limitations in the claim sufficiently describe the "physically distributed" nature of the call center without adopting Defendants' proposed construction.   But, even assuming construction were required, again, "physically separated" still incorporates the idea of being either remote or in close proximity (i.e., the routing system is still separate in both instances).   The Defendants again try to read the '092 patent's description of "close proximity" completely out of the claim and use only the term "remote," which will add confusion to the jury since that is contrary to what the '092 patent expressly discloses.   Thus, Alto Ventures urges the Court to adopt its position that no construction of this preamble term is necessary.

**f.   "termination point" / "termination point (500 or 600)"**

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "termination point" / "termination point (500 or 600)"<br><br>['092 patent (Claims 1, 16)] | no construction necessary | "a terminal device associated with a specific human operator agent that receives incoming calls" |

---

[11] *See Catalina Mktg. Int'l v. Coolsaving.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Alto Ventures does not believe this phrase, "termination point," should be construed. Alto Ventures believes that a jury is more than capable of understanding what "termination point" means.  Namely, it is a point or place where a call can be terminated.  Alto Ventures believes that a jury could understand such a term without any further construction from the Court.

Defendants, on the other hand, propose that "termination point" be construed as something completely unnecessary and unwieldy in view of the rest of the claim, namely, "a terminal device associated with a specific human operator agent that receives incoming calls."  Again, Defendants are trying to read limitations into the claim that is not required by the claim or the '092 patent specification. For example, claim 14 which depends claim 1, informs us that Defendants' construction is wholly improper.  Claim 14 reads:

> 14. The method according to claim 1 further including the step of dynamically redirecting the call from the termination point to a further termination point.

So, claim 14 informs us that the "termination point" of claim 1 can be a final termination point, or some interim termination point before the call is directed on to its final destination. The '092 patent specification tells us specifically:

> The designated termination point could be within the company itself, an offsite agent, or an offshore agent.  Alternatively, the incoming phone call could also be routed first to an automated touch-tone or voice response system for further processing before being then handed off to a human agent. '092 Patent at col. 4:45–49.

Thus, when the '092 patent talks about termination points, it first tells us that the termination points could be within the company (not specific to an agent), but also tells us that, "alternatively," the termination point could be an automated voice response system that then hands off the call to another termination point and operator/agent.  That is precisely what claim 14 is directed to.  Therefore, because independent claim 1 must encompass a scenario wherein the call is sent to an interim termination point, e.g., an automated system, as in

dependent claim 14, or a human agent termination point, the Defendants' proposed construction limiting claim 1 to *just* sending the call to a human agent would violate the tenet of claim differentiation[12] and directly violate how the specification defined various possible termination points—including to a company or an automated voice response system (neither of which comprises a human termination point).  As such, Defendants' proposed construction must be rejected.

### g.  "incoming gateway" / "incoming gateway (301)" / "incoming gateway apparatus (301)"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "incoming gateway" / "incoming gateway (301)" / "incoming gateway apparatus (301)" ['092 patent (Claims 1, 16)] | no construction necessary | "a device operated by the telecommunications carrier that receives calls and splits the calls into two distinct components, one comprising the information about the call and one comprising the voice content of the call" |

Alto Ventures does not believe this phrase, "incoming gateway," should be construed. Alto Ventures believes that a jury is more than capable of understanding what "incoming gateway" means in the context of the asserted claims.  Alto Ventures believes that a jury could understand such a term without any further construction from the Court.

All that Defendants are doing with this proposed construction is trying to take a second bite at the apple with respect to the concept of "separating the call into components."

---

[12] *See, e.g.*, *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("In *Phillips*, this court noted that dependent claims can supply additional context for construing the scope of the independent claims associated with those dependent claims.  An independent claim impliedly embraces more subject matter than its narrower dependent claim. In this case, [a dependent claim] discloses '[t]he braking device of claim 1 wherein said intermediary is magnetic.'  This dependent claim shows both that the claim drafter perceived a distinction between magnetic and non-magnetic intermediaries and that independent claim 1 impliedly embraced non-magnetic intermediaries.") (internal citations omitted).

1    If the Court properly construes the term "separating" in Section IV.a above as proposed by

2    Alto Ventures, then the Defendants are trying again here to ask the Court to add the idea of

3    splitting the call into components to the asserted claims.   First, Defendants' proposed

4    construction here has nothing to do with trying to help the jury identify what the incoming

5    gateway is, but second, for all the reasons discussed under the term "separating" in Section

6    IV.a above, Defendants' position is directly contrary to Figure 1 and the disclosure of the '092

7    patent.   Again, Figure 1 shows the incoming gateway receiving already-split VOIP calls, so

8    the Defendants' construction cannot be accurate. Likewise, while a scenario wherein the

9    telecommunications carrier network continues to operate the incoming gateway is *one*

10   embodiment disclosed in the specification, such a scenario is not clearly *required* by the

11   plain language of the claims or the specification.   There is nothing in the specification or

12   prosecution history surrendering claim scope covering other scenarios, e.g., when the

13   incoming gateway is at a location that is distinct and separate from the call routing system,

14   but not necessarily co-located or operated by the network carrier.   There are no words of

15   "manifest exclusion" requiring the claim to be limited to only one possible embodiment, so

16   such limiting would be improper.

17

18

19

20        **h.  "outgoing gateway" / "outgoing gateway (308)"**

21

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "outgoing gateway" / "outgoing gateway (308)"<br><br>['092 patent (Claims 1, 16)] | no construction necessary | "a device operated by the telecommunications carrier that terminates calls to termination points" |

27        Alto Ventures does not believe this phrase, "outgoing gateway," should be construed.

28   Alto Ventures believes that a jury is more than capable of understanding what "outgoing

gateway" means.  Alto Ventures believes that a jury could understand such a term without any further construction from the Court.

Defendants, on the other hand, propose that "outgoing gateway" be construed as, "a device operated by the telecommunications carrier that terminates calls to termination points."  Defendants' proposed construction is unnecessary and unhelpful to a jury in view of the rest of the claim language.  For example, the outgoing gateway may be operated by and be co-located at the telecommunications carrier, or it may be located at some other location separate from the call routing system.[13]  As such, there are no words of "manifest exclusion" requiring the claim to be limited—even if that were the only embodiment disclosed in the specification.  Further, the remainder of claims 1 and 16 already specify that the content of the bearer channel is directed from the outgoing gateway to the selected termination point. Construing the term "outgoing gateway" to again include the idea that it "terminates calls to the termination points" would be redundant and not helpful to the jury.

### i.  "an apparatus (302) to connect an outgoing gateway (308) to the incoming gateway (301)"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "an apparatus (302) to connect an outgoing gateway (308) to the incoming gateway (301)"<br><br>['092 patent (Claim 16)] | no construction necessary | "a digital Voice-over-IP pathway, typically signaled using SIP or other protocols, which connects calls from incoming gateway 301 to element 303" |

Alto Ventures does not believe this phrase, "an apparatus (302) to connect an outgoing gateway (308) to the incoming gateway (301)," needs to be construed.  Alto

---

[13] '092 patent File History (attached as Exhibit C), Dec. 18, 2007 Amendment, pp. 8–9.

Ventures' position is that the phrase itself is self-explanatory and that a jury is more than capable of understanding what role the apparatus (302) plays in the claimed system.  While it is true that Defendant's proposed construction comes from language found in the patent-in-suit's specification (*See* '092 Patent, col. 3:1–2), that portion of the specification merely states that element 302 *represents* "a digital Voice-over-IP pathway, typically signaled using SIP or other protocols, which connects calls from incoming gateway 301 to element 303" in the embodiment depicted in Figure 1.  As mentioned above, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a ***clear intention to limit the claim scope*** using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim*, 358 F.3d at 906 (citation omitted) (emphasis added).  Thus, there is no need—and the Court is not permitted—to limit this term to the particular example described in column 3 of the patent-in-suit.  Alto Ventures believes that a jury could understand such a term, and that such term would most easily be given its most reasonable interpretation, without any further construction from the Court.

### j.   "agent screen visual display (502 or 602)"

| Claim Term | Alto Ventures' Construction | Defendants' Construction |
|---|---|---|
| "agent screen visual display (502 or 602)"<br><br>['092 patent (Claim 16)] | "a ***display device*** that may be utilized by a call-taking agent to view data sent from the agent interface server" | "a ***data terminal*** that may be utilized by a call-taking agent to view data sent from the agent interface server" |

1

2       A person of ordinary skill in the art reading the term "agent screen visual display" in

3  the context of the asserted '092 patent claims[14] would understand this term to mean "a

4  display device that may be utilized by a call-taking agent to view data sent from the agent

5  interface server."  This meaning is compelled by the plain claim language, and is confirmed

6  by the teaching of the specification.

7       Alto Ventures' proposed construction reflects the fact that the agent's display device's

8  primary purpose is indeed as a "display device" rather than a "data terminal."  As described

9  in the '092 patent's specification, "Real-time information such as callerID, agent scripts that

10  are associated with that incoming phone number at 201, and other agent-specific information

11  and/or call-specific information, are ***displayed*** in real-time to the agent."  '092 patent, col.

12  3:14–18.  The dispute with regard to this term is that Defendants' proposed construction calls

13  for the Court to construe the "agent screen visual display" as a "data terminal."  Element 502

14  is alternately described in the specification as an "agent screen visual display," a "computer,"

15  a "computer terminal," and a "data terminal."  However, Defendants' proposed construction

16  *requiring* the term to be construed as a "data terminal" would be unduly narrowing and make

17  the term less clear to a jury.  For instance, it is not clear whether a "data terminal" would

18  even need a visual display element.  A "data terminal" might be incorrectly interpreted by the

19  jury to mean a computer system with only data processing capabilities.

20  

21  

22       As mentioned above, Alto Ventures' proposed construction clarifies for the jury that

23  the "agent screen visual display" is indeed a display device that has the role of "provid[ing]

24  call-specific information regarding the call."

25

26  ─────────────────

27  [14] Claim 16 recites, in part, " . . .an apparatus (405) for contemporaneously signaling from a the call control system to an ***agent screen visual display (502 or 602)*** at the termination point (500 or 600) to provide call-specific information regarding the call . . ." (emphasis added).

28

1

2    **V.    <u>CONCLUSION</u>**

3        For the aforementioned reasons, it is respectfully requested that the Court adopt

4    Plaintiff's proposed constructions of the various terms set forth above.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated: July 5, 2012

2

3                                          Respectfully submitted,

4                                          By: /s Keith A. Rutherford

5                                          Jonathan T. Suder [TX Bar No. 19463350]
                                           Michael T. Cooke [TX Bar No. 04759650]
6                                          Todd I. Blumenfeld [TX Bar No. 24067518]
                                           FRIEDMAN, SUDER & COOKE, P.C.
7                                          Tindall Square Warehouse No. 1
                                           604 E. 4th Street, Suite 200
8                                          Fort Worth, Texas 76102
                                           Telephone: (817) 334-0400
9                                          Facsimile:   (817) 334-0401
                                           Email: jts@fsclaw.com
10                                         Email: mtc@fsclaw.com
                                           Email: blumenfeld@fsclaw.com
11
                                           Keith A. Rutherford [TX Bar No. 17452000]
12                                         Daniel R. Peterson [TX Bar No. 24065899]
                                           WONG, CABELLO, LUTSCH, RUTHERFORD
13                                              & BRUCCULERI, L.L.P.
                                           20333 SH 249, Suite 600
14                                         Houston, Texas  77070
                                           Telephone: (832) 446-2400
15                                         Facsimile:   (832) 446-2424
                                           Email: krutherford@counselip.com
16                                         Email: dpeterson@counselip.com

17                                         L. Kristopher Rath, Esq. [NV Bar No. 5749]
                                           HUTCHISON & STEFFEN, LLC
18                                         Peccole Professional Park
                                           10080 West Alta Drive, Suite 200
19                                         Las Vegas, Nevada  89145
                                           Telephone: (702) 385-2500
20                                         Facsimile:   (702) 385-2086
                                           Email: krath@hutchlegal.com

21
                                           **Counsel for Plaintiff**
22                                         **ALTO VENTURES, INC.**

23

24

25

26

27

28

1

**CERTIFICATION OF DISCLOSURES**

2

3          Pursuant to LR 16.1-5, Counsel for Plaintiff attests that the above disclosures are

4    made to the best of its knowledge, information, and belief, formed after a reasonable inquiry

5    under the circumstances.    Counsel also attests that the information contained herein is

6    correct at the time it is made, and provides a complete statement of the information presently

7    known to Counsel regarding their claim construction positions.

8          DATED: July 5, 2012.

9

10                                                    By: /s Keith A. Rutherford_____

11                                                         Attorney for Plaintiff Alto Ventures, Inc.

12

13

14                                          **CERTIFICATE OF SERVICE**

15          I hereby certify that on the 5th day of July, 2012, the foregoing document was served

16    via Electronic Mail on the Defendants' attorneys of record who have consented in writing to

17    accept this Notice as service of this document by electronic means.

18

19

20                                                    /s  Nanci D. Mohr___
                                                         Nanci D. Mohr

21

22

23

24

25

26

27

28